UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER PAYTON MAY-SHAW,

        Plaintiff,

v.

CITY OF GRAND RAPIDS, *et al.*,

        Defendants.
                                    /

Case No. 1:19-cv-117

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by a federal prisoner, Christopher May-Shaw, against state officials pursuant to 42 U.S.C. § 1983.[1] This matter is now before the Court on a motion to dismiss filed by defendants Michael Mesman and Peter Thompson (ECF No. 19).

**I.    Background**

May-Shaw's § 1983 action involves incidents which occurred in the City of Grand Rapids prior to his federal incarceration. In his complaint, May-Shaw sues the City of Grand Rapids, the Grand Rapids Police Department (GRPD), GRPD Detective Michael Mesman, GRPD Officer Peter Thompson, GRPD Sergeant Jonathan Wu, and unknown officials named as John and Jane Doe ##1-8 (Unknown Part(y)(ies)). This Court previously summarized May-Shaw's claims as follows:

> Plaintiff alleges that he was under investigation by the GRPD for distributing narcotics in the Kent County area. Plaintiff resided with his girlfriend in an apartment complex, at 4346 Norman Drive, Apt. 4, in Grand Rapids, Michigan. Due to physical barriers, including a six-foot fence and a carport

---

[1] The Court notes that Christopher May-Shaw, the plaintiff in this civil litigation, was also a defendant in a federal criminal case, the appellant in a federal criminal appeal, the subject of a state search warrant, and the owner in a state forfeiture proceeding. For purposes of clarity, the undersigned will refer to him as "May-Shaw", unless quoting from a document.

1

structure, officers could not conduct visual surveillance of Petitioner's [sic] address and car from the public street.

Without obtaining a warrant, Defendant Mesman and the other Defendants decided to place a camera on a utility pole, above the line of sight of an officer standing on the ground. The camera was installed on January 26, 2016, and it remained in place for several weeks, recording Plaintiff's activities when he was at or near his vehicle. In early February 2016, in order to get a still closer look at the location, a surveillance utility van was stationed in the apartment parking lot, where it gathered and recorded information.

On February 18, 2016, after several weeks of continuous surveillance of Plaintiff's home and vehicles, Defendants allegedly trespassed into the curtilage of Plaintiff's home without a warrant, in order to stand by Plaintiff's two vehicles. One vehicle (a 2015 Chevy Tahoe) was parked in a spot in front of the home, and the second vehicle (a 2003 BMW 745) was parked in the carport in parking spot "4," the space assigned to Plaintiff's apartment. Defendants stood by the vehicles, awaiting the arrival of a canine and handler to conduct a sniff of the vehicle. Defendant Thompson led his canine into the carport. When the canine alerted to something in the vehicle, Defendant Mesman finally prepared an affidavit seeking an arrest warrant. In his affidavit, Defendant Mesman advised the issuing judge about the dog-sniff search, but he alleged that the vehicle was located in an open parking lot, not in a carport.

Upon receiving a warrant, Defendants searched the vehicles and Plaintiff's home. They discovered cocaine, heroin, marijuana, and $201,833.16. Defendants seized the cash and the 2003 BMW. Plaintiff alleges that Defendants never provided him notice of either the seizure or the forfeiture of those items.

Plaintiff was not at the residence at the time of the search. Plaintiff's girlfriend arrived at the home during the search, and she was arrested and charged with criminal offenses. Plaintiff was charged and a warrant was issued for his arrest by the 61st District Court of Michigan. Plaintiff was arrested in June 2016 in New York, and he was held on the Michigan warrant. In 2017, the State of Michigan dropped the charges against Plaintiff.

Plaintiff contends that the individual Defendants' actions to surveil and trespass on the curtilage of his apartment violated the Fourth Amendment. He also claims that Defendants deprived him of his property without due process, in violation of the Fifth and Fourteenth Amendments. Plaintiff further alleges that Defendants City of Grand Rapids and the Grand Rapids Police Department are liable for the actions of their employees, because they failed to oversee and audit the conduct of those employees.

Plaintiff seeks compensatory and punitive damages, including the return of his forfeited property and the reimbursement of attorney fees incurred in the dismissed criminal prosecution.

Opinion (ECF No. 12, PageID.57-58). On initial screening pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c), the Court dismissed defendants City of Grand Rapids, Grand Rapids Police Department, Sgt. Wu, and the unknown parties. *Id*. at PageID.63; Order regarding partial dismissal (ECF No. 13). The civil rights case proceeded against Detective Mesman and Officer Thompson.

Court records reflect that May-Shaw's complaint omits relevant facts related to the search, seizure, and forfeiture that are part of the public record. While the State of Michigan dropped criminal charges in 2017, a federal grand jury charged May-Shaw with five counts related to the possession with intent to distribute cocaine and heroin, and maintaining a drug involved premises. *See United States v. Christopher May-Shaw*, 1:17-cr-57 (ECF No. 1) (indictment) (W.D. Mich. Feb. 22, 2017). May-Shaw's present 4th Amendment claim was raised in a motion to suppress filed during the federal criminal case. *Id.* (ECF No. 54) (Defendant's Motion to suppress). In this regard, defendant Detective Mesman testified at length during the hearing on May-Shaw's motion to suppress, addressing the allegations set forth May-Shaw's present civil complaint. *Id*. (ECF No. 109) (Hearing Transcript). This Court addressed May-Shaw's 4th Amendment claims and denied his motion to suppress the evidence seized by the GRPD. *Id.* (Hearing Transcript); (ECF No. 64) (Order denying motion). Ultimately, May-Shaw pled guilty to count one of the first superseding indictment (conspiracy to distribute and possess with intent to distribute cocaine and heroin). *Id*. (ECF No. 28) (First Superseding Indictment) and (ECF No 94) (Judgment).

3

Under the plea agreement, May-Shaw's guilty plea was conditional, "in that the defendant reserves the right, on appeal from the judgment, to seek review of the adverse determination of his motion to suppress" and that "[i]f the defendant prevails on appeal of that determination, he will be allowed to withdraw his guilty plea." *Id*. (ECF No. 68, PageID.257) (Plea Agreement).[2] As discussed below, May-Shaw appealed his guilty plea. On appeal, the Sixth Circuit rejected May-Shaw's 4th Amendment claims and affirmed the district court's denial of his motion to suppress. *See United States v. May-Shaw*, 955 F.3d 563 (6th Cir. 2020).

## II.   Defendants' motion to dismiss

### A.   Legal standard

Defendants bring this motion pursuant to Fed. R. Civ. P. 12(b)(6), which seeks dismissal for failure to state a claim upon which relief can be granted.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). In this regard, *pro se* complaints, like the one filed

---

[2] The plea agreement also refers to additional money ($105,145.31) which the Drug Enforcement Agency seized from May-Shaw on June 16th and August 11th, 2016. PageID.259-260. May-Shaw's § 1983 complaint does not involve this money seized by the federal authorities. In addition, the federal plea agreement states that, "[t]his agreement applies only to crimes committed by the Defendant" and that "[t]his agreement does not apply to any pending forfeiture proceedings, and shall not preclude any past, present, or future civil or forfeiture actions." PageID.262. Given this restriction, the undersigned refers to the plea agreement for historical purposes only.

4

in this case, "are to be held to less stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (internal quotation marks omitted).

Finally, defendants' motion includes copies of court records from May-Shaw's federal criminal case. As discussed, that case involved the same 4th Amendment claims he is asserting in the present civil case. Defendants also submitted copies of court records from the state forfeiture proceeding at issue. This Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008). Here, the Court may consider defendants' attachments, as well as the related state and federal court records. These attachments and records are related to the events referred to in the complaint including: the surveillance; the search; the seizure of the property; the criminal charges and arrest warrant issued by the state court; the federal court's resolution of May-Shaw's 4th Amendment claims; May-Shaw's arrest in New York; and the state forfeiture proceedings.

In reaching this determination, the Court is aware of Fed. R. Civ. P. 12(d), which sets forth the general rule that, if "matters outside the pleadings are presented to and not excluded by the court" in the context of a motion to dismiss, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, the Court may take judicial notice of public records, such as court proceedings, in deciding a motion under Rule 12(b)(6) without converting that motion into one for summary judgment. *See Buck v. Thomas M. Cooley Law School*, 597 F.3d 812, 816 (6th Cir. 2010) ("Although typically courts are limited to the pleadings when faced with a motion under Rule 12(b)(6), a court may take judicial notice of other court

proceedings without converting the motion into one for summary judgment."). Accordingly, the Court will consider these court records and address defendants' motion as one filed pursuant to Fed. R. Civ. P. 12(b)(6).

### B. Plaintiff's causes of action

May-Shaw seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Here, May-Shaw set out four "causes of action" in which he seeks injunctive and monetary relief for alleged constitutional violations. In his "First Cause of Action," May-Shaw alleged that "Illegal search of plaintiff's vehicle parked within the carport and curtilage was [sic] violation of 4th Amendment." Compl. at PageID.9. In his "Second Cause of Action," May-Shaw alleged that "Illegal placement of surveillance van equipped with video camera within the homes [sic] curtilage without a warrant was 4th Amend. Violation". *Id*. at PageID.10. In his "Third Cause of Action," May-Shaw alleged "Seizure of $201,833.16, vehicle, clothing and other property without notice or due process violated 5th and 14th Amendment." *Id*. at PageID.11. Finally, in his "Fourth Cause of Action," May-Shaw alleged "Monell claim city/supervisory liability" against the City of Grand Rapids. *Id*. at PageID.12. The Fourth Cause of Action is no longer before the Court.[3]

---

[3] The Court rejected May-Shaw's *Monell* claim and dismissed the City of Grand Rapids. *See* Opinion (PageID.60-61); Order for partial dismissal (PageID.64).

6

### C. The *Heck* bar

Defendants contend that May-Shaw's claims are barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). In *Heck*, the Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been [overturned]." *Edwards v. Balisok*, 520 U.S. 641, 646 (1997) (emphasis in original). In *Heck*, the Supreme Court held that a state prisoner cannot make a cognizable claim under §1983 for an allegedly unconstitutional conviction or for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless a prisoner shows that the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87 (footnote omitted).

Defendants' cursory argument set forth in their brief does not address the *Heck* bar in a meaningful manner. *See* PageID.91-92. In this regard, defendants do not address the standard of review applicable to a 4th Amendment claim under *Heck*, do not address how May-Shaw's conditional guilty plea affects the *Heck* analysis, and do not address the extent to which *Heck* would apply to a civil forfeiture claim arising from a criminal action. As one court observed in a case involving a similar conditional guilty plea (*i.e.*, conditioned on the appeal of a denied motion to suppress evidence):

> The *Heck* doctrine applies with some limitations in the Fourth Amendment context, however. "By way of a now well-known footnote, the *Heck* Court observed that even if successful, some Fourth Amendment claims brought under § 1983 'would not necessarily imply that the plaintiff's conviction was unlawful' due to doctrines like independent source, inevitable discovery, and harmless error." *Id*. (quoting *Heck*, 512 U.S. at 487 n. 7). In 2007, the Supreme Court stated that "a

7

> Fourth Amendment claim can necessarily imply the invalidity of a conviction, and . . . if it does it must, under *Heck*, be dismissed." *Wallace v. Kato*, 549 U.S. 384, 395 n. 5 (2007) (emphasis added). The Sixth Circuit "comports with that position, placing the onus on the district court to assess on a case-by-case basis whether a favorable Fourth Amendment judgment would impugn the validity of an outstanding conviction." *Harper*, 293 Fed. Appx. at 391-92.  In essence, "*Heck* bars § 1983 Fourth Amendment claims where the contested search produced the only evidence supporting the conviction and no legal doctrine could save the evidence from exclusion." *Id*. at 392. However, in situations in which a conviction would not necessarily be impugned even if the defendant succeeds on his § 1983 Fourth Amendment claims, *Heck* does not bar the defendant's suit. *Id*.

*Jackson v. Palmer*, No. 5:15-CV-00066-TBR, 2018 WL 912274 at *3 (W.D. Ky. Feb. 15, 2018).

Defendants have failed to meet their burden with respect to dismissal under *Heck*. "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Accordingly, defendants' motion to dismiss should be denied with respect to this claim.

### D. Qualified Immunity

Defendants also seek dismissal on the basis of qualified immunity.

> Qualified immunity is an affirmative defense that extends to government officials performing discretionary functions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815-16, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  It "protects public officials from liability for civil damages if their conduct does not violate 'clearly established statutory or constitutional statutory rights of which a reasonable person would have known.' " *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ). To determine whether an officer is entitled to qualified immunity, courts apply a two-tiered inquiry.  *Id*. "The first step is to determine if the facts alleged make out a violation of a constitutional right."  *Id*. "The second step is to ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it."  *Id*. The Court may address these two steps in any order.  *Id*. If either factor is not satisfied, qualified immunity shields the officer from damages.  *Id*.
>
> In sum, "[t]o survive [a] motion to dismiss on qualified-immunity grounds, the plaintiff must allege facts that 'plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right.' " *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)

8

(quoting *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) ). "The plaintiff also must allege with particularity 'facts that demonstrate what each defendant did to violate the asserted constitutional right.'" *Id.* (quoting *Heyne v. Metropolitan Nashville Public Schools*, 655 F.3d 556, 564 (6th Cir. 2011)).

*Weston Rayfield*, 373 F.Supp.3d 962, 969-70 (W.D. Mich. 2018).

May-Shaw's 4th Amendment claims in the present § 1983 action are identical to the claims raised in his motion to suppress evidence which this Court rejected in his federal criminal case. On appeal, the Sixth Circuit reviewed this Court's ruling and held that there were no 4th Amendment violations. The Sixth Circuit set out a comprehensive discussion of May-Shaw's claims in a published decision which is set out below.

The Sixth Circuit summarized May-Shaw's claims as follows:

May-Shaw moved the district court to suppress the evidence seized pursuant to the search warrant, arguing that the warrantless surveillance through the pole camera and the warrantless sniff by the drug-detecting dog of the BMW constituted unconstitutional warrantless searches. The district court denied the motion, holding that (1) May-Shaw had no reasonable expectation of privacy in the parking lot; (2) the area surveilled by the pole camera was not constitutionally protected curtilage of the apartment; (3) the dog sniff was permitted under the Fourth Amendment; and (4) even if the dog sniff was unconstitutional, the remainder of the information in the warrant affidavit was sufficient to support probable cause for the search warrant.

\*   \*   \*

May-Shaw's motion to suppress invokes the Fourth Amendment, which protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. May-Shaw maintains that his Fourth Amendment rights were violated when the police conducted warrantless surveillance of the carport outside of his apartment, and when they used a drug-detecting dog to sniff his car that was parked in that carport. We address each argument in turn.

*May-Shaw*, 955 F.3d at 566-67.

First, the Sixth Circuit rejected May-Shaw's long-term surveillance claim:

May-Shaw argues that the district court erred in finding that the long-term surveillance of the carport did not constitute a search. Under Fourth Amendment jurisprudence, there are two ways in which government action may constitute a

9

search. First, when the government gains information by physically intruding into a constitutionally protected area—namely, "persons, houses, papers, and effects," U.S. Const. amend. IV—" 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.' " *Morgan v. Fairfield Cty.*, 903 F.3d 553, 561 (6th Cir. 2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 5, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013)). Second, as articulated by the Supreme Court, a search occurs when "a government official invades an area in which 'a person has a constitutionally protected reasonable expectation of privacy.'" *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (quoting *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). Under the latter framework, there are two requirements for a government intrusion to constitute a Fourth Amendment search: first, a person must exhibit "an actual (subjective) expectation of privacy" in the place or thing searched; second, the expectation is one "that society is prepared to recognize as 'reasonable.' " *Katz*, 389 U.S. at 361, 88 S.Ct. 507.

Because the officers' use of the pole camera did not involve any sort of physical intrusion into a constitutionally protected area, May-Shaw must show that he had a reasonable expectation of privacy in the carport. Cobbling together dicta from several Fourth Amendment cases, he argues that, although police may permissibly observe the curtilage of a home for a short period of time, for example with an aerial flyover, *see California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), long-term video surveillance of a home's curtilage is problematic under the Fourth Amendment, *see United States v. Anderson-Bagshaw*, 509 F. App'x 396, 405 (6th Cir. 2012). There is at least some support for that proposition, as this court and five Justices of the Supreme Court have noted concerns about the problems with long-term warrantless surveillance. *See id.*; *see also United States v. Jones*, 565 U.S. 400, 415, 429-30, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring and Alito, J., concurring).

Although this argument may be compelling in theory, as applied here, it is foreclosed by this circuit's case law, which has consistently held that this type of warrantless surveillance does not violate the Fourth Amendment. For example, in *United States v. Houston*, we held that affixing a video camera to the top of a utility pole to record the defendant's front porch over a ten-week period did not violate the defendant's Fourth Amendment rights because "agents only observed what [the defendant] made public to any person traveling on the roads" surrounding his home. 813 F.3d 282, 288 (6th Cir. 2016). We rejected the defendant's claim that the length of the period of monitoring made the surveillance constitutionally unreasonable, reasoning that it is the possibility—not the practicability—that the police could have themselves sat atop the utility pole and observed the same view for every waking moment of a ten-week period that is critical. *Id*. at 289-90. That reasoning was applied in *United States v. Powell*, in which we held that the warrantless surveillance of three buildings through the installation of video cameras on three public utility poles, for periods of up to 90 days each, did not violate the defendants' Fourth Amendment rights. 847 F.3d 760, 773 (6th Cir. 2017). And, even assuming

10

> that May-Shaw is correct that the carport constitutes the curtilage of his apartment—an argument that we find unpersuasive, for reasons discussed below—that is of no consequence to the constitutional analysis of the video surveillance. We held in *Houston* that warrantless video surveillance of the defendant's front porch, which is unquestionably within the curtilage of his home, did not violate his reasonable expectation of privacy because the camera "captured only views that were plainly visible to any member of the public who drove down the roads bordering" his home. *Houston*, 813 F.3d at 288.
>
> May-Shaw contends that the pole camera did not provide the same vantage point that was readily accessible from the street. The district court, however, held that the area surveilled by the pole camera was readily accessible from a public vantage point. This is a factual finding that is reviewed for clear error. Officer Mesman testified that the vantage point from the pole camera was the same as the vantage point from the street, and nothing in the record contradicts that assertion. Therefore, the district court's factual finding that the pole camera recorded the same view enjoyed by an individual standing on Norman Avenue was not clearly erroneous.
>
> Furthermore, the surveillance footage and photos here did not "generate[ ] a precise, comprehensive record of [May-Shaw's] public movements that reflects a wealth of detail about [his] familial, political, professional, religious, and sexual associations," *Jones*, 565 U.S. at 415, 132 S.Ct. 945 (Sotomayor, J., concurring), which could raise significant Fourth Amendment concerns. Rather, the footage and photos only revealed what May-Shaw did in a public space—the parking lot. They captured images of May-Shaw moving things from his car to his apartment. The video showed when he arrived and left the apartment. In other words, the cameras observed only what "was possible for any member of the public to have observed . . . during the surveillance period." *Houston*, 813 F.3d at 290.
>
> May-Shaw has not demonstrated that when the government surveilled the carport for twenty-three days, it violated his reasonable expectation of privacy and thus conducted an unconstitutional search. We find no error in the district court's judgment that the pole-camera surveillance did not violate May-Shaw's Fourth Amendment rights.

*Id.* at 567-69 (footnote omitted).

Then, the Sixth Circuit rejected May-Shaw's 4th Amendment claim involving the search of the car:

> May-Shaw also argues that the district court should have granted his motion to suppress because the use of the drug-detecting dog to sniff his BMW while it was parked in the carport constituted an unlawful search under the Fourth

11

Amendment. This argument hinges on one issue: whether the carport where the vehicle was parked constitutes the curtilage of the apartment.

As relevant here, the Fourth Amendment protects the people from "unreasonable searches" of "their . . . houses." And, as a general rule, the curtilage of a home is protected by the Fourth Amendment. *See United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *see also Jardines*, 569 U.S. at 6, 133 S.Ct. 1409 (noting that the area "immediately surrounding and associated with the home" is "part of the home itself for Fourth Amendment purposes" (quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984))). That rule is well-rooted in history. "At the founding, curtilage was considered part of the 'hous[e]' itself." *Collins v. Virginia*, ––– U.S. ––––, 138 S. Ct. 1663, 1676, 201 L.Ed.2d 9 (2018) (Thomas, J., concurring) (alteration in original) (quoting 4 W. Blackstone, Commentaries on the Laws of England 225 (1769) ("[T]he capital house protects and privileges all its branches and appurtenants, if within the curtilage.")). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Id.* at 1670 (majority opinion) (quoting *Ciraolo*, 476 U.S. at 212-213, 106 S.Ct. 1809).

Although it is well-settled that the warrantless search of a home's curtilage with a drug-sniffing dog violates the Fourth Amendment, *Jardines*, 569 U.S. at 11-12, 133 S.Ct. 1409, what constitutes curtilage for purposes of the Fourth Amendment generally, and in the present case in particular, are harder questions. If the carport was within the curtilage of May-Shaw's apartment, then the dog sniff constituted an unconstitutional warrantless search under *Jardines*, but if the carport was not within the curtilage, then the sniff was not a search, and therefore was not constitutionally problematic. *See United States v. Perez*, 440 F.3d 363, 375 (6th Cir. 2006) (holding that using a drug-sniffing dog on a car parked in a hotel parking lot, which was not stopped, detained, or moved, did not constitute a search).

Courts have identified four factors as guideposts to determining whether an area falls within a home's curtilage: (1) the proximity of the area to the home, (2) whether the area is within an enclosure around the home, (3) how that area is used, and (4) what the owner has done to protect the area from observation from passersby. *Morgan*, 903 F.3d at 561 (citing *Dunn*, 480 U.S. at 301, 107 S.Ct. 1134). These factors are not to be applied mechanically; rather, they are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301, 107 S.Ct. 1134. In the application of the factors, the onus is on May-Shaw: he "bears the burden of establishing that the challenged search violated his Fourth Amendment rights." *United States v. Coleman*, 923 F.3d 450, 455 (6th Cir. 2019) (quoting *United States v. Witherspoon*, 467 F. App'x 486, 490 (6th Cir. 2012)).

The Supreme Court recently held that an enclosed driveway abutting a house constituted the curtilage of the home. *Collins*, 138 S. Ct. at 1670-71. In *Collins*, police searched a motorcycle that was covered by a tarp and was parked in a section of a driveway that was partitioned off by two brick walls and a wall of the house itself. *Id*. at 1670. "A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch." *Id*. at 1671. The Court held that the driveway enclosure "constitute[d] 'an area adjacent to the home and "to which the activity of home life extends," ' and so is properly considered curtilage." *Id*. (quoting *Jardines*, 569 U.S. at 7, 133 S.Ct. 1409).

May-Shaw argues that *Collins* is dispositive here, and that because the carport was partially enclosed, it constitutes the curtilage of the apartment. But *Collins* does not mandate that result. At least three cases in this circuit cut against May-Shaw's position.

First, there is *Coleman*, mentioned above. There, we found that the defendant's car was not within the curtilage of his condo when it was parked in his condominium complex's driveway, reasoning in part that the driveway was communal and other condo residents frequently walked past cars parked in front of the condo units. 923 F.3d at 456-57; *see also United States v. Jones*, 893 F.3d 66, 72 (2d Cir. 2018) ("[*Collins*] has no effect on [the defendant's] appeal, which fails because the driveway in which [the defendant's] vehicle was parked was the shared driveway of tenants in two multi-family buildings and was not within the curtilage of [his] private home.").

In addition, two Sixth Circuit cases decided prior to *Collins*—*United States v. Galaviz*, 645 F.3d 347 (6th Cir. 2011), and *United States v. Estes*, 343 F. App'x 97 (6th Cir. 2009)—are instructive. Those cases involved unenclosed driveways that were adjacent to a home, and abutted a sidewalk or alley, with no steps taken by the resident to obstruct the view of passersby. *Galaviz*, 645 F.3d at 356; *Estes*, 343 F. App'x at 101. In both cases, we held that officers did not intrude upon the curtilage by entering the driveway. In *Galaviz* we found that although the driveway was adjacent to the house, it was not enclosed by any barrier, and the portion where cars were parked was directly adjacent to a public sidewalk. *Galaviz*, 645 F.3d at 356. And in *Estes*, the driveway was not curtilage because it was not enclosed, the defendant had not taken any steps to protect it from observation by passersby, and it was used as a point of entry to the defendant's residence. *Estes*, 343 F. App'x at 101.

May-Shaw directs the court's attention to several cases—one from the Sixth Circuit, and three from district courts within our circuit—in an attempt to establish a broad rule that a carport is always within the curtilage of a home. *See* Appellant Br. at 26. But each of the cases he cites is factually distinct. As the first case he

13

cites for that proposition states, "[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts." *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598 (6th Cir. 1998) (alteration in original) (quoting *United States v. Reilly*, 76 F.3d 1271, 1276 (2d Cir. 1996))).

In *Daughenbaugh*, as May-Shaw notes, our court held that a detached garage was within the curtilage of a home. *Id*. at 601. But there, the garage was "within natural boundaries demarcated by the river and the heavy tree coverage . . . [and] the backyard and garage [were] not readily visible from the street." *Id*. at 599. We considered these natural boundaries to be compelling evidence that the garage was within the curtilage of the home. *Id*. Furthermore, the garage was set far back from the road, and a large tree prevented neighbors, those parked in the driveway, and those on the street from viewing the interior of the garage. *Id*. at 600. Important to the court's calculus was that the "contents [of the garage] were only visible after a person entered the backyard and approached the garage." *Id*.

Here, although the carport where May-Shaw parked his vehicles was the closest in proximity to his apartment, it was not as close to the residence as other structures found to be curtilage have been. But in any event, that factor is not determinative "without reference to the additional *Dunn* factors." *Daughenbaugh*, 150 F.3d at 599. In *Collins*, *Coleman*, *Galaviz*, and *Estes*, the areas at issue were all driveways that, unlike the carport here, directly abutted homes or condominiums. And even in those cases where the driveway was connected to the home, the courts each held that the driveway was not curtilage.

The second factor—whether the area is an enclosure around the home—also cuts against May-Shaw. Here, although the area was enclosed, at least to the extent that the carport had a roof and two side walls, it was not in an enclosure around the residence as was the walled-off driveway in *Collins*, nor was it enclosed within natural boundaries of the property like the detached garage in *Daughenbaugh*.

The third factor, which relates to May-Shaw's use of the carport, arguably weighs in his favor because, by regularly parking his car in the carport, he contends it was sufficiently "associated with the activities and privacies of domestic life" to ostensibly support a finding that it was within the curtilage of his apartment. *Dunn*, 480 U.S. at 303, 107 S.Ct. 1134. However, there is no evidence that May-Shaw had any legal right to exclude others from the carport.

Furthermore, May-Shaw did little to protect the area from the view of passersby, and so the fourth factor weighs against him. With respect to this last consideration, May-Shaw's case falls somewhere in between *Collins* and *Coleman*. Like the driveway in *Collins*, the carport here was partially enclosed, which cuts at least somewhat in his favor. But, like in *Coleman*, May-Shaw took no additional steps to protect the area from passersby. He did not, as did the petitioner in *Collins*, cover his vehicle to shield it from view from his neighbors. *See* 138 S. Ct. at 1668.

14

> And because officers could see into the carport from a camera affixed to a utility pole across a street, it is apparent that May-Shaw did not take significant steps to protect the area from observation.
>
> The burden is on May-Shaw to establish that the carport is "intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Collins*, 138 S. Ct. at 1670 (quoting *Ciraolo*, 476 U.S. at 212-13, 106 S.Ct. 1809). He has not done so. May-Shaw has failed to establish that the carport constituted the curtilage of his apartment; the drug dog sniff therefore did not constitute a search. *See Perez*, 440 F.3d at 375. Because we hold that neither the pole-camera surveillance nor the dog sniff constituted a search, we need not decide whether the evidence would have been admissible under the independent-source doctrine or the good-faith exception.

*Id.* at 569-72.

For these reasons, the Sixth Circuit concluded that plaintiff's 4th Amendment claims set forth in his motion to suppress were without merit and that no constitutional violation occurred. The Sixth Circuit's reasoning and conclusion with respect to the 4th Amendment claim apply with equal force to May-Shaw's present § 1983 claim, which is based upon the same facts as the criminal appeal. May-Shaw has failed to make out a constitutional violation. Accordingly, defendants are entitled to dismissal on the basis of qualified immunity.[4]

### E.  Due process violation related to forfeiture

May-Shaw alleged that the forfeiture of the money, BMW, and other property violated his constitutional rights under the 5th and 14th Amendments because he "was never provided Notice of Seizure and/or forfeiture by Defendants or Kent County Prosecutors Office" [sic]. Compl. at PageID.8. May-Shaw also alleged that "[w]hile the Kent County Prosecutors

---

[4] Defendants did not raise, and the Court does not address, whether May-Shaw's 4th Amendment claim in this § 1983 action was barred by collateral estoppel. *See, e.g., United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 662-63 (6th Cir. 2003) (the Sixth Circuit rejected the claimants' argument in a forfeiture case that the district court erred in denying their motion to suppress the currency as the product of an illegal seizure, stating in part that "[T]he district court correctly ruled that the Claimants' motion to suppress was barred by collateral estoppel. The Claimants had made an identical motion in state court, in which they similarly argued that the search warrant supporting the search of their home was based on false statements. The issues were identical, the issue was actually litigated in the first proceeding, and the issue was 'necessary and essential to the judgment on the merits.' *United States v. Three Tracts of Prop.*, 994 F.2d 287, 290 (6th Cir. 1993).").

15

office [sic] were informed of my arrest [in New York], Plaintiff was still never served or put on notice of such forfeiture or seizure of US currency or vehicles, and other property" *Id*. at PageID.8. May Shaw further alleged that "[w]hile Plaintiff was held in New York, Plaintiff was not provided due process or Notice of any forfeiture or seizure proceedings that was enforced by the City of Grand Rapids or it's agents at the Prosecuting Attorneys office [sic]." *Id*. at PageID.9.

Defendants contend that May-Shaw's due process claims should be dismissed because his property was properly seized under Michigan's civil asset forfeiture statute. Defendants' Brief at PageID.98-99. In its complaint of forfeiture, the City of Grand Rapids alleged that, "[t]he subject matter of this action was seized by the Grand Rapids Police Department incident to a lawful arrest in Kent County, Michigan, or pursuant to a valid search warrant, or based on probable cause pursuant to MCL 333.7522(c) or (d)." *See City of Grand Rapids v. $203,262.00*, 16-02678 (Kent Co. Cir. Ct.) (Complaint for Forfeiture) (ECF No. 20-5, PageID.121)).[5] Defendants contend that the City of Grand Rapids and the Kent County Prosecutor followed Michigan's forfeiture scheme. On March 24, 2016, the Kent County Prosecutor filed a complaint on behalf of the City of Grand Rapids to seize May-Shaw's property in an *in rem* action pursuant to M.C.L. § 333.7501 *et seq*. PageID.121-124. The subject matter of the action was described as "Two Hundred Three Thousand Dollars in US currency ($203,262.00), 2003 BMW VIN #WBAGN63433DS43006, ZTE cell phone, Vividar camera, portable speaker, Beats Head Phones, 3 Mens designer belts, and a New Box Security System." *Id*. The complaint identified May-Shaw as the owner of the BMW and a resident of the apartment which the officers searched. A summons

---

[5] *See* M.C.L. § 333.7522 which provides in pertinent part that "Property that is subject to forfeiture under this article . . . may be seized upon process issued by the circuit court having jurisdiction over the property. Seizure without process may be made under any of the following circumstances: (a) Incident to a lawful arrest, pursuant to a search warrant, or pursuant to an inspection under an administrative inspection warrant. . . (c) There is probable cause to believe that the property is directly or indirectly dangerous to health or safety. (d) There is probable cause to believe that the property was used or is intended to be used in violation of this article or section 17766a."

was issued on March 24, 2016, identifying May-Shaw as the owner of the property and advising him to answer the complaint or to take other lawful action.  PageID.125.  After about 1½ months had passed, the Kent County Circuit Court authorized service of the complaint and summons by publication "for reasons stated on the record."[6]  *See* Order (May 13, 2016) (PageID.126-127).  The City published a notice providing "Service of Process by Publication" in the Grand Rapids Press on May 19th, May 26th, and June 2nd, 2016.  *See* Proofs of publication (PageID.128-130).  The notices advised May-Shaw that he needed to file an answer to the complaint for forfeiture within 28 days of the last notice published in Kent County.  *See* PageID.128-130.  Because May-Shaw failed to answer the Complaint within 28 days after the final publication, the Kent County Circuit Court entered a judgment against him on July 13, 2016 (41 days after final publication).  *See* Judgment of forfeiture by default (PageID.131-132).

The Court concludes that defendants prevail, but not for the reason set forth in their brief.  Rather, May-Shaw's due process claim is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986).

> Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).  Because Plaintiff's claim is premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir.1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir.1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

---

[6]The Court notes that the order is dated May 13, 2016, but recites the date of the Court hearing as May 16, 2016. *See* PageID.126-127.

> Plaintiff has not sustained his burden in this case. Plaintiff has not alleged that state post-deprivation remedies are inadequate. Indeed, when property is seized pursuant to the Michigan Controlled Substances Act, Mich. Comp. Laws § 333.7101 *et seq.*, there are remedies available to contest that seizure. . . .

*Morris v. Etue*, No. 1:15-cv405, 2015 WL 3623590 at *2 (W.D. Mich. June 10, 2015), *affirmed* No. 15-1818 (Order) (6th Cir. Jan. 28, 2016).

As the Sixth Circuit noted, neither May-Shaw nor his third car was present when defendants conducted the search, and May-Shaw was arrested some months later in New York. *See May-Shaw*, 955 F.3d at 566. Under the circumstances, former defendant City of Grand Rapids obtained a court order to allow service of the complaint and summons by publication. When May-Shaw failed to respond, the state court entered a judgment in the City's favor. While May-Shaw was deprived of his property, an adequate post-deprivation remedy existed, so the deprivation was not "without due process of law." *See Morris*, 2015 WL 3623590 at *2 (quoting *Parratt*, 451 U.S. at 537). Accordingly, May-Shaw's due process claim is barred.

In his response, May-Shaw does not dispute the statutory authority for the forfeiture. Rather, May-Shaw contends that his due process rights were violated because former defendant City of Grand Rapids failed to personally serve him with a summons or notice of forfeiture. May-Shaw raises two claims. First, May-Shaw contends that the Kent County Prosecutor could have mailed the summons or notice to a different address in Grand Rapids, where May-Shaw now claims he resided with his mother. *See* Response (ECF No. 26, PageID.177-178). May-Shaw's claim that he resided with his mother is without merit on its face, being contradicted by his complaint (which alleged that he resided in the apartment at the Norman Drive and that the police conducted warrantless surveillance when they "trespassed" and "encroached" within the curtilage of his home) (PageID.4-5), and by the court records (which refer to the "apartment where May-Shaw lived" as the Norman Drive address and that "May-Shaw often parked his vehicles

18

under a covered carport close to the entrance of his apartment building") (*May-Shaw*, 955 F.3d at 565, 567). Second, May-Shaw claims that the City of Grand Rapids or the Kent County Prosecutor could have served him with the summons sometime after he was arrested in New York (June 15, 2016), because the summons did not expire until June 23, 2016. PageID.177-178. May-Shaw's second argument is without merit because service by publication was completed on June 2, 2016, about two weeks before he was arrested in a different state.[7]

Moreover, May-Shaw cannot salvage his § 1983 action by claiming that the City of Grand Rapids or its attorney failed to give him proper notice of the forfeiture action. As this Court stated in *Morris*:

> Even if Plaintiff did *not* receive proper notice, there may have been other means to challenge the forfeiture. The Michigan Court of Appeals has held that where property is seized and forfeited after the state failed to provide proper notice to the owner, the owner can file a complaint to recover the property. *See Hollins v. City of Detroit Police Dep't*, 225 Mich. App. 341, 571 N.W.2d 729, 732 (Mich. Ct. App. 1997). Plaintiff does not allege that this, or any other post-deprivation remedy, would have been inadequate to afford him complete relief for the deprivation of his property. Consequently, he does not state a due process claim.

*Morris*, 2015 WL 3623590 at *3 (emphasis in original). For all of these reasons, defendants' motion should be granted with respect to May-Shaw's due process claim related to the state forfeiture action.

---

[7] The Court notes that neither of May-Shaw's due process theories involve the actions of the two remaining defendants, Detective Mesman and Officer Thompson. Based on his filings, May-Shaw has failed to state a claim against these defendants. "Personal involvement is necessary to establish section 1983 liability." *Murphy v. Grenier*, 406 Fed. Appx. 972, 974 (6th Cir. 2011). "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999). For this reason, the Court could *sua sponte* dismiss May-Shaw's due process claims against defendants Mesman and Thompson pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) ("Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . (B) the action or appeal . . . (ii) fails to state a claim on which relief may be granted[.]").

### III. Recommendation

Accordingly, I respectfully recommend that defendants' motion to dismiss (ECF No. 19) be **GRANTED** and that this action be **DISMISSED**.

Dated: May 13, 2020            /s/ Ray Kent
                               United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).